IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE

| | | |
|---|---|---|
| CYNTHIA D. EVANS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:14-cv-1721 |
| | ) | |
| | ) | |
| VANDERBILT UNIVERSITY | ) | Judge Sharp |
| MEDICAL CENTER, | ) | Magistrate Judge Brown |
| | ) | |
| Defendant. | ) | Jury Demand |
| | ) | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

Comes now Plaintiff ("Plaintiff" or "Ms. Evans"), and responds to Defendant's Motion for Summary Judgment. In opposition to the issues in Defendant's Motion for Summary Judgment, the Plaintiff relies upon the entire record as a whole.

Defendant has conceded that Plaintiff can establish a prima facie case. Plaintiff similarly concedes that Defendant has stated a legitimate, non-discriminatory reason for Ms. Evans' termination. The issue in dispute then is whether Defendant's stated legitimate, non-discriminatory reason is mere pretext. Plaintiff will show that Defendant would not have terminated Plaintiff "but-for" her age by showing that Defendant has not terminated other, similarly-situated employees who made the same mistakes that Plaintiff made. Plaintiff was an excellent employee with a long history of positive performance evaluations. In spite of her excellent work history, Plaintiff will show that Defendant chose to escalate Plaintiff's discipline to the highest rung of its progressive discipline ladder, thereby defeating the purpose of having

1

such a progressive policy. Finally, Plaintiff will demonstrate that Defendant did not afford Plaintiff a meaningful opportunity to be heard either during the investigation into the events involved, or afterwards at Defendant's own appeals process. For the reasons listed above, and as more fully detailed below, Plaintiff will show that Defendant's stated, non-discriminatory reason is mere pretext. Moreover, because the issue of whether Defendant's stated legitimate, non-discriminatory reason is pretext is a matter that must be shown through the use of indirect evidence, the weighing of said evidence is a question of fact that not appropriate for disposal at the summary judgment level, but is a matter for a jury to decide.

## LEGAL ANALYSIS

### A. Standard of Review

Defendant as moving party has the initial burden of showing the Court, by reference to the record, the basis for the motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). When the non-moving party has the burden of proof at trial, the movant must carry the initial burden in one of two ways: either by negating an essential element of the non-movant's case or by showing that there is no evidence to support a fact necessary to the non-movant's case. *See Clark v. Coats & Clark, Inc.,* 929 F. 2d 604, 606-08 (11th Cir. 1991). Before the Court can even evaluate the Plaintiff's opposition to the motion, it must first determine whether the Defendant has met its initial burden of showing that there are no issues of material fact and that Defendant is entitled to judgment as a matter of law. *Jones v. City of Columbus,* 120 F. 3d 248, 254 (11th Cir. 1997) (per curiam). Bold, conclusory statements that the Plaintiff cannot meet their burden at trial are insufficient. Only after the movants have met their initial burden does the burden shift to the non-moving party to "demonstrate that there is indeed a material issue of fact that precludes summary judgment." 929 F. 2d at 608.

As the Supreme Court stated in *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-252 (1986), summary judgment is inappropriate unless the evidence is so one-sided that a reasonable jury could arrive at only one conclusion. 477 U.S. at 251-252. "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge." *Id.* at 255. In ruling on a motion for summary judgment, the Court should never weigh the evidence or find the facts. Instead, under F.R.C.P. 56, the Court's role is narrowly limited to assessing the threshold issue of whether a genuine issue exists as to material facts requiring a trial. *Id.* at 249. "Summary judgment procedure is not a substitute for trial." *Stone v. Hinds,* 541 S.W. 2d 598, 599 (Tenn. Ct. App. 1976). Where disputed material facts exist, they are to be resolved by a trial on the merits. *Id.* As the court evaluates the evidence, it must do so in the light most favorable to the non-moving party and draw all reasonable inferences in the Plaintiff's favor. *Stovall v. Clarke,* 113 S.W.3d 715, 721 (Tenn. 2003).

Reasonable inferences are inferences reasonably drawn from all facts then before the Court. Reasonable inferences are not necessarily more probable or likely than other inferences that might tilt in the moving party's favor. Instead, so long as more than one reasonable inference can be drawn, and that inference creates a genuine issue of material fact, the trier of fact is entitled to decide which inference to believe and summary judgment is not appropriate. *Hunt v. Cromartie,* 526 U.S. 541, 552 (1999).

Further, it is well established that questions concerning a person's state of mind (such as motive, knowledge, intent, good faith, bad faith, malice, fraud, conspiracy, or consent) are rarely disposable at the summary judgment stage. *See Hutchinson v. Proxmire,* 443 U.S. 111 (1979); *Graham v. Long Island R.R.,* 230 F. 3d 34, 38 (2nd Cir. 2000) (commenting that summary judgment is used "sparingly" where intent and state of mind are implicated); *EMI Catalogue Partnership v.*

3

*Hill, Holliday, Conners, Cosmopulos, Inc.,* 228 F.3d 56, 61 (2nd Cir. 2000) ("caution" must be observed with issues involving a defendant's intent); *Seamons v. Snow,* 206 F.3d 1021, 1027-1028 (10th Cir. 2000) (noting that granting of summary judgment is especially questionable in cases delving into a party's state of mind); *United States, ex rel. Cantekin v. University of Pittsburgh,* 192 F.3d 402, 411 (3rd Cir. 1999) (noting the "basic rule" that state of mind issues typically should not be decided on summary judgment); *Mendocino Envt'l Ctr. v. Mendocino County,* 192 F.3d 1283, 1302 (9th Cir. 1999) (observing that state of mind questions are factual issues inappropriate for summary judgment); *Geier v. Medtronic, Inc.,* 99 F.3d 238, 240 (7th Cir. 1996) (applying summary judgment standard with special scrutiny where cases turn on issues of intent and credibility); *Hossaini v. Western Missouri Med. Ctr.,* 97 F.3d 1085, 1088 (8th Cir. 1996) (recognizing the difficulty of disposing intent issues at the summary judgment stage).

Consequently, when considering summary judgment in cases where the defendant's state of mind is at issue, courts must be mindful that the state of a person's mind is a fact which, if in dispute, must be resolved by a jury. If the credibility of the employer's witnesses is challenged and specific grounds for possible impeachment have been shown, summary judgment should be denied and the case allowed to proceed to trial, as this represents the type of dispute that should be left to the trier of fact. *Lodge Hall Music, Inc. v. Waco Wrangler Club, Inc.,* 831 F.2d 77, 81 (5th Cir. 1987).

### B. ADEA

Under the terms of the ADEA it is unlawful for an employer to "to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). An employee may establish an ADEA claim "'by offering either direct or

4

circumstantial evidence of age discrimination.'" *Lefevers v. GAF Fiberglass Corp.*, 667 F.3d 721, 724 (6th Cir. 2012) (quoting *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003)). Where the complaining party is unable to proffer direct evidence, the Sixth Circuit requires plaintiffs to establish a prima facie case under the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), that is, through indirect evidence. *Id.* at 725; *see also Geiger v. Tower Automotive*, 579 F.3d 614, 622 (6th Cir. 2009) ("In this circuit, however, while recognizing the differences between Title VII and the ADEA, we have long found the *McDonnell Douglas* framework useful in analyzing circumstantial evidence of ADEA claims.").

### C. Pretext

Once the employee successfully makes out a prima facie case, a mandatory presumption of discrimination is created and the burden shifts to the employer to proffer a non-discriminatory reason for discharging the employee. *Monette v. Elec. Data Sys Corp.,* 90 F.3d 1173, 1185 (6th Cir. 1996). If the employer is able to sustain its burden, then the mandatory presumption evaporates into a permissive inference, and the burden shifts back to the employee to show by a preponderance of the evidence that the employer's proffered reason for discharge was actually a pretext intended to hide unlawful discrimination. *Id.* at 1186.

An employee may demonstrate that an employer's proffered, non-discriminatory reasons for an adverse employment action are pretextual by revealing the "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's explanation. Three of the most common ways to undermine an employer's proffered reasons include: (1) establishing that the proffered reasons have no basis in fact; (2) establishing that the proffered reasons did not actually motivate the adverse employment action; or (3) establishing that the proffered reasons were insufficient to motivate the adverse employment action. Pretext may be shown either directly, by

5

persuading the trier of fact that a discriminatory reason more likely motivated the employer or indirectly, by showing that the employer's proffered explanation is unworthy of belief. *Smith v. Chrysler Corp.*, 155 F. 3d 799, 805-806 (6th Cir. 1998).

### D. Analysis

Ms. Evans had been an employee of Defendant's since 1994. (Evans Dep. at 30:20 [Evans Dep. excerpted pp. attached hereto as Ex. 1]). During that time Ms. Evans had been repeatedly praised for her excellent performance and her contribution to ensuring that Vanderbilt maintained its "reputations for excellence in patient care, research and education." (Campbell Dep. Ex. 1 [attached hereto as Ex. 2]). Ms. Evans' conduct and performance were of such a high caliber that she was afforded a merit raise in years that took performance into account. (Campbell Dep. at 20:19 [Campbell Dep. attached hereto as Ex 3]). Ms. Evans received such a merit-based pay increase during the year immediately preceding her termination, which Defendant alleged to be based upon poor performance. (Campbell Dep. Ex. 1 [attached hereto as Ex. 2). Ms. Evans' score on her performance evaluation in the year preceding her termination was a 4.0 out of a possible 5 points. (Campbell Dep. at 22:9 [Campbell Dep. attached hereto as Ex. 3]; Campbell Dep. Ex. 2 [attached hereto as Ex. 4]). Some of the metrics that go into making up this score are evaluations from the employee themselves, evaluations from peers, and evaluations from the employee's supervisors. (*Id*.). Defendant therefore had an employee with nearly 20 years of experience and an excellent performance record. (Evans Dep. at 30:20 [Evans Dep. excerpted pp. attached hereto as Ex. 1]; Campbell Dep. Ex. 2 [attached hereto as Ex. 4]).

Defendant uses a progressive discipline system which has four steps—beginning with a verbal warning and culminating at termination of any employee. (Campbell Dep. at 26:5 [Campbell Dep. attached hereto as Ex. 3]; Campbell Dep. Ex. 3 [attached hereto as Ex. 5]). The

purpose of the progressive discipline policy is to allow Defendant's employees to have a discussion with their supervisors when there is a policy violation, to attempt to prevent said policy violation from occurring again, and to allow for increased discipline in the event that a policy is repeatedly violated.  (Campbell Dep. at 26:8-16; 45:25-46:3 [Campbell Dep. attached hereto as Ex. 3]).  Ms. Evans' direct supervisor acknowledged that in terminating her without any coaching, Ms. Evans was not given an opportunity to improve her behavior, which is the point of a progressive discipline policy. (Campbell Dep. at 47:9-10 [Campbell Dep. attached hereto as Ex. 3]).

Defendant stated that it terminated Ms. Evans for violations of the controlled substance accountability policy.  (Campbell Dep. at 37:24-25, 38:1-3 [Campbell Dep. attached hereto as Ex. 3]).  Despite this being the stated reason for Ms. Evans' termination, her supervisor stated she had witnessed other nurses violating this policy without it resulting in their termination.  (Campbell Dep. at 28:19 [Campbell Dep. attached hereto as Ex. 3]).  Further, the physician ordering the medication is supposed to enter the order into the AcuDose machine, so Ms. Evans was not alone in her failure to immediately document the administration even in these particular instances.  (Campbell Dep. at 38:24 [Campbell Dep. attached hereto as Ex. 3]).  The resident physicians had been told by a supervising physician not to use verbal orders, such as the one given to Ms. Evans on the dates in question; rather, to enter their medication needs into the AcuDose machines.  (Campbell Dep. Ex. 6 [attached hereto as Ex. 6).  In this case the orders that the resident physician was supposed to have entered into the AcuDose machine had not been entered even after five days had elapsed.  (Campbell Dep. Ex. 6 [attached hereto as Ex. 6]; Campbell Dep. at 42:4-16 [Campbell Dep. attached hereto as Ex. 3]).  Ms. Campbell acknowledges that by failing to enter the medication order into the AcuDose machine that the resident physician created a risk of harm to the patient.  (Campbell Dep. at 42:19-20 [Campbell Dep. attached hereto as Ex. 3]).  Further,

7

the resident physician was sitting at a computer that he could have used to enter the order in question when he issued the verbal order in violation of the proscription the residents had been given against issuing verbal orders. (Campbell Dep. at 43:21-44:21 [Campbell Dep. attached hereto as Ex. 3]). Defendant's stated reason for Ms. Evans' termination was that she violated policy by failing to enter orders for the medication that she retrieved from the AcuDose machine at the behest of the resident physicians. (Campbell Dep. at 37:24-25 [Campbell Dep. attached hereto as Ex. 3]). However, Ms. Evans' direct supervisor was unable to cite a policy that prescribed the amount of time in which a nurse has to enter orders for medication into an AcuDose machine. (Campbell Dep. at 45:10-13 [Campbell Dep. attached hereto as Ex. 3]).

Ms. Evans has conceded from the beginning that she failed to document the medication that she retrieved from the AcuDose machine at the time it was retrieved. (Def's Concise Statement of Undisputed Material Facts ["SUMF"], DE 29, SUMF No. 21). However, she asserts that Defendant's articulated legitimate reason for her termination does not have a justification in fact by showing that "the sheer weight of the circumstantial evidence of discrimination makes it more likely than not that the employer's explanation is pretext, or coverup" [sic]. *Allen v. Highlands Hospital Corp.*, 545 F.3d 387 398 (6th Cir. 2008). There are several people who could have put the order into the AcuDose machine, beginning with the ordering physician who was the most capable of doing so. (Campbell Dep. at 43:21-44:21 [Campbell Dep. attached hereto as Ex. 3]). Ms. Evans' direct supervisor admitted that there have been other instances of nurses failing to properly document medication administration or the retrieval of medication from the AcuDose machine without being subject to termination (Campbell Dep. at 28:19 [Campbell Dep. attached hereto as Ex. 3]), and finally, despite the claim that Ms. Evans was terminated for a failure to follow policy, her supervisor was not able to cite a single policy that prescribed a time limit for

8

Case 3:14-cv-01721    Document 34    Filed 10/15/15    Page 8 of 14 PageID #: 399

the documentation of such medication administration. (Campbell Dep. at 45:10-13 [Campbell Dep. attached hereto as Ex. 3]). When the fact that the progressive discipline policy was not used, and Ms. Evans was given no opportunity at coaching in order to improve her performance (Campbell Dep. at 47:9-10 [Campbell Dep. attached hereto as Ex. 3]), Defendant's stated legitimate purpose is revealed to be illegitimate and mere pretext.

Once Defendant became aware of the discrepancies, Ms. Evans was placed on administrative leave while an investigation was conducted. (SUMF No. 23). A multidisciplinary team referred to a Code N Committee was convened to look into the discrepancies. (SUMF No. 25). This Committee consisted of Sabrina Downs, the Director of Professional Nursing Practice; Susan Amsler, HR employee relations; Andrea Bryant, Program Director of the Controlled Substances and Inventory Integrity; Stephanie Dean, Assistant Manager of EAP; Robin Mutz, the Administrative Director of Women's Health; Mark Sullivan, Director of Pharmacy; Jillian Russell, Nursing Education and Professional Development Specialist; Christina White, Senior HR Consultant; and Jenny Campbell, Interim Nurse Manager – OB-Gyn. (SUMF No. 26). The findings of the Code N Committee are contained in a report generated by the committee, and consist of notes from several of its members. (Campbell Dep. Ex. 5 [attached hereto as Ex. 7]). Some of these findings were that Ms. Evans' "wasting practice" (the procedure to be used when more medication is dispensed than is used) is strong; the review of Ms. Evans' January medication record indicated no problems or discrepancies, that she was an 18-year employee, and that Dr. Spetalnick specifically ordered the residents that were present to enter the medications into the AcuDose machine. (*Id.*). During this same period of time, Andrea Bryant suggested that Ms. Evans might need to be included on a "watch list" to ensure that there were no problems in future. (Campbell Dep. Ex. 11 [attached hereto as Ex. 8]). This indicates that Ms. Bryant did not believe

9

that termination was appropriate under the circumstances, as an employer would have no need to watch a terminated employee for future missteps. This email was sent to Christina White, another member of the Committee and Senior HR representative, who responded, "Agree on all counts." The indication then is that Ms. White is also of the opinion that termination was not the appropriate remedy for this particular situation. The Code N Committee also entertained several ideas regarding possible disciplinary methods, such as demotion, final written warning, and possibly termination. (Campbell Dep. Ex. 5 [attached hereto as Ex. 7]). Both the discussion by the Code N Committee and the suggestion of the "watch list" by Ms. Bryant were done with full knowledge of all administration errors committed by Ms. Evans over the course of the three-day period in question. (Campbell Dep. Ex. 5 & 11 [attached hereto as Ex. 7 & 8, respectively]). The decision to terminate Ms. Evans was made by Christina White, Susan Amsler, Pam Jones, Robin Mutz, and Jennifer Campbell. (Campbell Dep. at 33:2-3 [Campbell Dep. attached hereto as Ex. 3]). At this point, by happenstance and prior to the termination, two of the five people allegedly responsible for the decision to terminate Ms. Evans stated that they were not in favor of such.

During the course of Ms. Campbell's investigation into these events, she made several comments in emails to her colleagues that belie disdain for Ms. Evans. (Campbell Dep. Ex. 4 & 9 [attached hereto as Ex. 9 & 10, respectively]). First, in an email to Susan Amsler, Ms. Campbell stated, "I spoke w/Cindy King[1] (she called my cell just now and I didn't recognize the number), a statement that only makes sense if Ms. Campbell were attempting to avoid Ms. Evans during a time when Ms. Evans' input would have been most crucial—that is the time during the investigation. (Campbell Dep. Ex. 4 [attached hereto as Ex. 9]). Next, Ms. Campbell wrote to Dr. Spetalnick, the physician, under the guise of requesting his perspective on the days in

---

[1] Cindy King is a previous name for Cindy Evans

10

question, but in reality advised him of what she wanted to hear by asking him to "…provide a statement…that none of the 3 incidents was an emergency situation?" Despite Ms. Campbell's prompting, Dr. Spetalnick advised her that, "The physicians caring for the patient certainly appreciated the charge nurse taking a lead role and helping the staff nurse," "Interactions by Ms. King in the room were professional and helpful," and "No interactions or service in the pt's room were suspect or unprofessional." (Campbell Dep. Ex. 9 [attached hereto as Ex. 10]). Plaintiff asserts that Ms. Campbell's behavior during the course of the investigation was not that of a neutral investigator, but someone with an agenda. In this case, Ms. Campbell's agenda was that of ensuring that Ms. Evans was not allowed to return to work.

As a part of its argument that Ms. Evans was treated fairly, and not discriminated against, Defendant points out that she was afforded an opportunity to appeal her termination. (SUMF No. 50). The first part of the appeals process involves mediation in which Ms. Evans and her immediate supervisor were brought together to allow Ms. Evans' supervisor the opportunity to reconsider her decision to terminate Ms. Evans. (Campbell Dep. at 49:5-11 [Campbell Dep. attached hereto as Ex. 3])*.* However, Defendant also admits that there was no way in which Ms. Evans could have gotten her job back through this mediation because the person Defendant sent as its representative to the mediation, which is a part of its own appeals process, did not have the authority to reverse Ms. Evans' termination. (Campbell Dep. at 50:2-3 [Campbell Dep. attached hereto as Ex. 3]). Because Defendant sent Ms. Evans to a mediation that had no purpose, Plaintiff asserts that Defendant also engaged in pretext by going through the motions of having a mediation that could have no impact on the situation at hand. Because Defendant never intended to consider the matter based on the facts, Plaintiff asserts that this is further evidence that Defendant intended to terminate her unlawfully and *solely* as a result of her age.

11

Summary judgment is inappropriate unless the evidence is so one-sided that a reasonable jury could arrive at only one conclusion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-252 (1986). In this case, there are multiple indications that Ms. Evans' termination was not based upon her violations of Defendant's policies. The indications range from the fact that others had violated the same policy without being subjected to termination, to the fact that almost half of the people supposedly responsible for the decision to terminate her were not in favor of termination and indicated as much prior to the conference call during which Ms. Evans was ultimately dismissed. Further, despite having a long-term employee (who would necessarily be older), Defendant chose not to utilize any of the lesser steps available in its progressive discipline policy and did not coach Ms. Evans on her violation of policy in an attempt to help an employee with an exemplary employment record maintain the excellent standard of care it had praised her for less than one year prior to her termination.

So long as more than one reasonable inference can be drawn, and that inference creates a genuine issue of material fact, the trier of fact is entitled to decide which inference to believe and summary judgment is not appropriate. *Hunt v. Cromartie,* 526 U.S. 541, 552 (1999).

A person's state of mind (such as motive, knowledge, intent, good faith, bad faith, malice, fraud, conspiracy, or consent) is rarely disposable at the summary judgment stage. *See Hutchinson v. Proxmire,* 443 U.S. 111 (1979). There is no doubt but that the motive for an employer's termination of an employee is a question that must be resolved by reference to said employer's state of mind. Plaintiff has pointed to several factors that would tend to demonstrate that an employer's proffered, non-discriminatory reasons for an adverse employment action are pretextual by revealing the "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Defendant's explanation. *Smith v. Chrysler Corp.*, 155 F. 3d 799, 805-806 (6th Cir. 1998).

12

In conclusion, Defendant's Motion for Summary Judgment should be denied for the following reasons. Primarily, Defendant's state of mind is a factual question and, as such, is a matter for a jury to decide. Defendant's state of mind is brought into question by three main issues: Ms. Evans suffered termination, where other, similarly situated employees did not for the same infraction; Ms. Evans was not afforded use of Defendant's progressive discipline process or meaningful use of Defendant's appeals process; and there are indications that almost half the people responsible for the decision were not in favor of her termination during the course of their investigation into the events in question. For all of these reasons, Defendant's Motion for Summary Judgment is improper and should be denied.

Respectfully submitted,

**ALLMAN & ASSOCIATES**

 /s/   Andy L. Allman           .

Andy L. Allman, #17857
131 Saundersville Road, Suite 110
Hendersonville, Tennessee  37075
Phone: (615) 933-0110
Facsimile: (615) 265-8766
andy@andylallman.com

*Counsel for Plaintiff*

# CERTIFICATE OF SERVICE

      I hereby certify that the foregoing Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment was filed and served via the Court's electronic case filing system to:

Kevin C. Klein
Allison L. Bussell
**THE KLEIN LAW OFFICE, PLLC**
814 Church Street, Suite 202
Nashville, Tennessee 37203

Kevin Davis
**OFFICE OF THE GENERAL COUNSEL, VANDERBILT UNIVERSITY**
University Counsel Vanderbilt University
2100 West End Avenue, Suite 750
Nashville, Tennessee 37203

*Counsel for Defendant*

on this the 15th day of October, 2015.

                                          */s/* Andy L. Allman
                                          Andy L. Allman