UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| CYNTHIA D. EVANS, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | No. 3:14-1721 |
| | ) | Judge Sharp |
| VANDERBILT UNIVERSITY MEDICAL CENTER, | ) | |
| Defendant. | ) | |

## MEMORANDUM

In this age discrimination case brought by Plaintiff Cynthia Evans, Defendant Vanderbilt University Medical Center ("Vanderbilt" or "VUMC") has filed a Motion for Summary Judgment (Docket No. 27). That Motion has been fully briefed by the parties and, for the reasons that follow, will be granted.

## I. Factual Background

In support of its Motion for Summary Judgment, Defendant filed a "Concise Statement of Undisputed Material Facts" that, for the most part, Plaintiff does not dispute. Those facts show the following:

Shortly after obtaining her nursing degree in 1994, Plaintiff became employed by Vanderbilt. She worked in various departments, ultimately landing in Women's Health, in the Obstetrics and Gynecology ("OB-Gyn") Department, where she worked as a charge nurse until her employment ended in 2013. Jennifer Campbell, who joined VUMC in 2009 as an Assistant Nurse

1

Manager, was Plaintiff's direct supervisor.[1] The Director of the OB-Gyn Department was Robin Mutz.

Vanderbilt's job description for a charge nurse sets "key role responsibilities" that include "demonstrating high standards of quality patient care," and "holding care providers accountable to clinical and service standards." (Pf. Depo., Docket No. 29-3 at 1). More specifically, Plaintiff was tasked with managing the flow of patients in and out of her unit, and attending to issues affecting the flow of services between Women's Health and other units.

As a charge nurse, Plaintiff had supervisory responsibilities that included distributing assignments to the group of approximately 15 nurses, care partners, and medical receptionists she supervised, and evaluating their performance. Her supervisor responsibilities also included holding those employees accountable to unit procedures, Vanderbilt polices, the "Vanderbilt Credo," and patient care and regulatory standards.

In addition to her supervisory role, Plaintiff was expected to be able to step in and serve as a staff nurse when circumstances required. For that reason, and so she could evaluate the nurses she supervised, Plaintiff was required to maintain a staff nurse's skill set.

During her employment at VUMC, Plaintiff was required to participate in annual training, including in-service and competencies.[2] She and the other nurses were also expected to keep abreast of hospital polices and were required to sign acknowledgments during the annual review process that they had reviewed and were current on all policies.

---

[1] In early 2013, Ms. Campbell became the Interim Nurse Manager over the OB-Gyn Department, until returning to her regular Assistant Nurse Manager position later that same year.

[2] "Competencies" are a yearly, "fair-like event" that involve listening to speakers, watching videos, engaging in hands-on activities, or other "particular things that were important to [the nurses'] jobs in OB." (Id. at 33-34)

At VUMC, medications are stored in an automated dispensing machine called AcuDose, of which there were three in Plaintiff's unit. Its scanner system is the hospital's preferred method for medication administration. When utilized, the system captures and records the administration of medication in real time.

To access the AcuDose system, employees are required to scan their fingerprints, or enter a code. To administer medicine, a nurse logs into the system, finds the patient, clicks on the patient's name, chooses the medication needed, and retrieves the medication. The nurse then takes the medication to the patient's room, scans the patient, scans the medication, and scans the patient again. Thereafter, the nurse can administer the medication to the patient.

To minimize errors, VUMC's Medication Administration policy requires nurses to "validate the five rights of medication administration." (Docket No. 29-5 at 2). Those "rights" are: the "right patient," the "right medication," the "right dose," the "right route" (e.g.,intramuscular, intravenous, intrathecally), and the "right time." (Id.). In fact, that policy dictates that, save for "urgent/emergent patient situations," "bar-code-assisted medication administration (BCMA)" should be utilized, and only after the order appears "in Care Organizer™." (Id. at 7).

Because most medication administration involves the AcuDose system, the substantial majority of medications are charted contemporaneously with their administration. When bar-code scanning in unavailable, however, nurses are supposed to "document medications utilizing the MAR [paper Medication Administration Record] or area specific process." Id.

To protect the integrity of a patient's chart, charting must be done immediately after the medication is given or as soon thereafter as possible, and, most certainly, at least by the end of the nurse's shift. This allows all those who review a patient's chart (including those on subsequent

3

shifts) to know what medication has been administered.

To deter potential diversion and so that the pharmacy can justify what it has in stock, medications must be accounted for, whether dispensed to a patient or wasted. In fact, VUMC's Controlled Substance policy provides that nurses are to "account for the entire amount of controlled substances obtained or dispensed," "use the smallest ampule or tubex available to satisfy the dosage," and "when the dosages dispensed is larger than the dose, document the total dose administered and the amount wasted to show the total disposition of the drug." (Docket No. 29-4 at 3-4). Further, "[t]wo licensed staff" must "witness any disposal or wastage of a controlled substance and document same on the drug disposition record, CDR [controlled drug record], or via the ADC [automated dispensing cabinet]." (Id. at 4).

On February 25, 2013, Ms. Campbell received an email from Vanessa Tompkins, a Certified Pharmacy Technician, that notified Ms. Campbell of a narcotics discrepancy in the OB-Gyn Department. Specifically, Ms. Tompkins' email indicated that, during a consecutive 3-day period between February 21 and 23, 2013, there were five Morphine 4mg vials dispensed by Plaintiff that had not been properly accounted for. Plaintiff, who was copied on that email, responded by (among other things) admitting that she was "guilty of the Morphine discrepancy." (Docket No. 29-6 at 1).

Shortly after receipt of the email, Ms. Campbell spoke by phone with Plaintiff. During that conversation, Plaintiff acknowledged that she did not document administration of the controlled substance, did not reconcile the discrepancies, and did not record the wasting. Plaintiff explained that she was not used to giving Morphine but could not explain why she failed to scan, waste, and document the narcotics as required by hospital policy. On February 28, 2013, Plaintiff was placed on administrative leave pending an investigation.

4

VUMC's "Code N Committee," a multi-disciplinary team, investigates and analyzes cases of suspected diversion. It is chaired by Sabrina Downs, the Director of Nursing Professional Practice.[3]

Ms. Campbell and Ms Mutz interviewed the nurses who had witnessed Plaintiff's actions on the three days in question. Janice Sedghi, who was with Plaintiff on February 21, 2013, stated that after entering a patient's room, she overheard a resident verbally order "Morphine IM" (intramuscular), which Plaintiff retrieved from the Acudose machine via "override" and administered to the patient. The retrieval of the morphine was not logged into the computer or patient's charts.[4] Plaintiff concedes that she did not enter the order, did not follow-up to confirm that someone had entered the order, nor did she chart that the morphine had been administered.[5]

Nurse Lee Ann Ingram was interviewed about the events that took place on February 22, 2013 that involved the same patient as the previous day. According to Ms. Ingram, Plaintiff assisted with a dressing change and again obtained Morphine from AcuDose through "override" after Ms. Sedghi noticed that there was no active order for Morphine for the patient. While Plaintiff asserts she told one of the residents that the "grayed out" (expired) order needed to be corrected, and that Dr. Bennett Spetalnick, the primary physician at the time, told the residents to enter the order,

---

[3] In Plaintiff's case, the remaining participants were Susan Amsler (HR employee relations), Andrea Bryant (Program Director for Controlled Substances and Inventory Integrity), Stephanie Dean (Assistant Manager of EAP), Ms. Mutz, Mark Sullivan (Director of Pharmacy), Jillian Russell (Nursing Education and Professional Development Specialist), Ms. Campbell, and Christina White (Senior HR Consultant).

[4] When a physician fails to document a verbal order for medication, it falls on the nurse to enter the order into the computer that then routes the order to the physician for signature.

[5] Ms. Sedghi also reported witnessing Plaintiff "waste" Morphine by squirting it across the room. This "waste" was not documented in AcuDose or in AdminRx, the system for accounting for controlled substances.

Plaintiff did not check to see whether the order had been entered, nor did she enter it herself as a verbal order. Additionally, and for the second time in two days, Plaintiff did not document that she administered the morphine and thus, there was no indication of it having been given in the patient's chart.

Ms. Ingram also reported having seen Plaintiff waste Morphine, but she did not know how much. Ms. Ingram was not asked to witness or document any wasted narcotics.

Nurse Belinda Gascon was interviewed about the events that took place on February 23, 2013. Ms. Gascon stated (and Plaintiff confirmed) that Plaintiff took a vial of Morphine from AcuDose and administered it based on a verbal order from a physician. Plaintiff did not enter the Morphine order, stating in her deposition that "[i]t would have taken time." (Docket No. 29-1, Pf. Depo. at 169). After telling Plaintiff "we have to scan this," Ms. Gascon scanned and documented the Morphine in AdminRX. Ms. Gascon refused to answer the interviewer's question about whether she had documented medication for Plaintiff in the past.

The Code N Committee concluded that the evidence failed to show Plaintiff diverted medication. According to Ms Downs, the Chair of the Committee, however, the evidence showed Plaintiff "failed to follow basic nursing protocol and violated VUMC's Controlled Substance and Drug Administration Policies in multiple, serious ways, creating safety issues for [Plaintiff's] patients." (Docket No. 31, Downs Decl. ¶ 5). Plaintiff's errors included not scanning or documenting the administration of medication in the patients records; failing to document waste of medication; failing to document a physician's verbal orders; and creating a discrepancy in the Acudose system that was not resolved over the course of several consecutive days.

After a conference call, senior leaders of the Code N Committee decided to terminate

6

Plaintiff's employment for violating the Controlled Substance and the Medication Administration policies on multiple occasions creating a risk of patient harm. On March 8, 2013, Plaintiff met with Ms. Campbell and Ms. Mutz, and was told that her employment was being terminated.

Five days later, Plaintiff appealed that decision. The termination decision was first upheld by Ms. Jones, the Chief Nursing Officer, and then by an appeals panel.

Plaintiff filed suit in this Court on August 24, 2014. Her only claim is that Defendant violated the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq*.

## II. Standard of Review

The standards governing summary judgment are well known. A party may obtain summary judgment if the evidence establishes there are no genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Covington v. Knox Cty. Sch. Sys., 205 F.3d 912, 914 (6th Cir. 2000). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in his or her favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## III. Application of Law

The ADEA prohibits an employer from failing or refusing to hire, discharging, or discriminating 'against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age[.]'" Geiger v. Tower Auto., 579 F.3d 614, 620 (6th Cir. 2009) (quoting 29 U.S.C. § 623(a)(1)). Where, as here, Plaintiff provides no direct

7

evidence of discrimination, the Court utilizes the familiar burden shifting approach set forth McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) for circumstantial evidence cases. Talley v. Family Dollar Stores, 542 F.3d 1099, 1105 (6th Cir. 2008).

To establish a prima facie case of age discrimination under the indirect method of proof, a plaintiff must show that she was (1) 40 or older at the time of the alleged discrimination; (2) subjected to an adverse employment action; (3) otherwise qualified for the position; and (4) replaced by a younger worker, or that similarly situated employees were treated more favorably. Tuttle v. Metro. Gov't of Nashville, 474 F.3d 307, 317 (6th Cir. 2007); Coomer v. Bethesda Hosp., Inc., 370 F.3d 499, 511 (6th Cir.2004). If the initial burden is met, the burden of production shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for the adverse action and, if it does so, the burden shifts back to the [plaintiff] to show that the proffered reason is a mere pretext masking the company's discriminatory actions." Bender v. Hecht's Dep't Stores, 455 F.3d 612, 624 (6th Cir. 2006). Although the burden of production shifts "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." DiCarlo v. Potter, 358 F.3d 408, 415 (6th Cir. 2004) (internal citation omitted).

In any employment case, "[t]he key question is always whether, under the particular facts and context of the case at hand, the plaintiff has presented sufficient evidence that he or she suffered an adverse employment action under circumstances which give rise to an inference of unlawful discrimination." Clay v. United Parcel Serv., Inc., 501 F.3d 695, 703 (6th Cir. 2007)) (citation omitted). Plaintiff has not done so in this case, particularly given the admissions she has made.

In both her deposition and her response to Defendant's "Concise Statement of Undisputed Material Facts," Plaintiff concedes that she violated the Medication Administration policy on

8

multiple days and violated the Controlled Substance policy through failure to record waste properly. She also acknowledges that failing to document the administration of Morphine is "more than a minor infraction," and that, given her multiple policy violations, some form of discipline was appropriate. Moreover, Plaintiff does not believe that either Ms. Jones or the panel acted improperly or unfairly; she simply disagrees with the termination decision.

Given Plaintiff's admissions, the only real question is whether the stated reasons proffered by Vanderbilt are but a pretext for discrimination. "A plaintiff will usually demonstrate pretext by showing that the employer's stated reason for the adverse employment action either (1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain the employer's action." White v. Baxter Healthcare Corp., 533 F.3d 381, 391 (6th Cir. 2008). "However, the plaintiff may also demonstrate pretext by offering evidence which challenges the reasonableness of the employer's decision 'to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation.'" Id. (citation omitted).

In this case, Plaintiff attempts to establish pretext in three ways. Plaintiff first asserts that she "suffered termination, where other, similarly situated employees did not for the same infraction[.]" (Docket No. 34 at 13). More specifically, she argues that "there are several people who could have put the order into the Acudose machine beginning with the ordering physician who was the most capable of doing so," and that Ms. Campbell "admitted that there have been other instances of nurses failing to properly document medication administration or the retrieval of medication from the AcuDose machine without being subject to termination." (Id. at 8).

The Sixth Circuit has "held that 'to be deemed similarly-situated, the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been

9

subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" McMillan v. Castro, 405 F.3d 405, 413 (6th Cir. 2005) (quoting Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992)). While "'plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered similarly-situated, . . . the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in all of the relevant aspects.'" Id. (quoting Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 352 (6th Cir. 1998)).

Simply asserting that "other people" could have put the order into the Acudose machine falls far short of establishing that those "people" (whoever they may be) were similarly situated to Plaintiff. Further, Plaintiff has failed to cite any evidence that she was similar in all relevant respects to the resident who she claims was likewise culpable.

As for other nurses, Plaintiff relies exclusively on the following excerpt from Ms. Campbell's deposition:

> Q. Were you aware of any instances of nurses creating discrepancies using the AcuDose machine and not being terminated?
>
> A. Yes. Simply creating a discrepancy -- well, what do you mean not (sic) using the AcuDose machine?
>
> Q. Sorry. I meant to say using the AcuDose machine and creating a discrepancy.
>
> A. And not being terminated?
>
> Q. Yes.
>
> A. Yes.
>
> Q. But how often does that happen?

A. It doesn't happen very often. I can't tell you exactly how often that happens.

Q. Do you recall any specific examples?

A. No.

(Docket No. 38-8, Campbell Depo. at 28-29). That excerpt hardly shows that other nurses found themselves in the same predicament as Plaintiff yet received a lesser sanction.

Plaintiff was not terminated simply because she created a discrepancy. She was terminated because she also failed to document the administration of medicine, failed to chart properly, failed to document a physician's verbal orders, and failed to document the waste of medicine. She identifies no one who engaged in anywhere near similar conduct.

Plaintiff next argues that she "was not afforded use of Defendant's discipline process or meaningful use of Defendant's appeal process[.]" (Docket No.34 at 13). With regard to the former, she argues that VUMC has a four-step disciplinary process that begins with a verbal warning, but, "rather than being given an opportunity to improve her behavior, which is the point of a progressive discipline policy," she was terminated. This argument totally ignores the fact that (1) the policy itself "allows for discipline to start at a higher step based on the severity and circumstances of the situation," (Docket No. 34-5 at 1); and, (2) in response to Defendants Statement of Undisputed Material Facts, Plaintiff concedes that both Ms. Campbell and Ms. Downs believed that her errors constituted a "serious violation so nursing protocol" and "created safety issues for patient." (Docket No. 33 at14, ¶ 45). "'[A]s long as the employer honestly believed in the proffered reason given for its employment action, the employee cannot establish pretext even if the employer's reason is ultimately found to be mistaken, foolish, trivial, or baseless." Banks v. Bosch Rexroth Corp., 610 Fed. App'x 519, 533 (6th Cir. 2015) (quoting Smith v. Chrysler Corp., 155 F.3d 799, 806 (6th

Cir.1998)).

With regard to her complaint about the appeals process, Plaintiff focuses only on the first step. She argues that because the HR representative who met with her and Ms. Campbell had no authority to reverse the termination, the "mediation . . . had no purpose." (Docket No. 34 at 11). That argument ignores the fact, however, that the termination decision was later upheld not only by Ms. Jones, but also by an appeals panel, and Plaintiff presents nothing to suggest that the decision to terminate her could not have been reversed during the second or third stage of the appeals process. Nor does Plaintiff claim any bias on behalf of the individuals involved in the last two steps in the process.

Finally, Plaintiff attempts to show pretext by arguing that "there are indications that almost half the people responsible for the decision were not in favor of her termination[.]" (Id. at 13). Leaving aside the obvious point that Plaintiff's own calculations suggest that the majority favored termination (even if, as Plaintiff argues, the Code N Committee "entertained several ideas regarding possible disciplinary methods, such as demotion, final written warning, and possibly termination"), her math does not add up.

Plaintiff argues that "two of the five people allegedly responsible for the decision to terminate [her] stated that they were not in favor of such," (id. at 10), and in support references an email from Ms. Bryant and one from Ms. White. In her email, Ms. Bryant suggested that Plaintiff might need to be placed on a "watch list," and, in a subsequent email Ms. White wrote, "[a]gree on all counts." (Id.). However, according to Defendant's Statement of Facts, which Plaintiff does not dispute, Ms. Bryant was not among the group of senior leaders who participated in the conference call which led to the decision to terminate Plaintiff's employment. Moreover, given the different

12

subject lines, it is not clear that Ms. White's "agree on all counts" email was in response to Ms. Bryant's email about placing Plaintiff on a watch list.[6]

### III. Conclusion

"To establish a disparate-treatment claim under the plain language of the ADEA . . . a plaintiff must prove that age was the 'but-for' cause of the employer's adverse decision." Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 176 (2009). "For an employer to take an adverse action 'because of age' means 'that age was the reason' that the employer decided to act." Scheick v. Tecumseh Pub. Sch., 766 F.3d 523, 529 (6th Cir. 2014) (quoting Univ. of Tex. Sw. Med. Ctr. v. Nassar, ––– U.S. ––––, 133 S.Ct. 2517, 2527 (2013). Plaintiff has failed to produce evidence from which a reasonable jury could conclude that, but for her age, she would have not been terminated, particularly giver her concession that she failed to follow proper protocol and the policies of her employer. Accordingly, an Order will be entered grant summary judgment to Defendant.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE

---

[6] Plaintiff also relies on two emails from Ms. Campbell which purportedly "belie disdain" for Plaintiff. Those innocuous emails do no such thing. In one, Ms. Campbell merely writes that she "spoke w/[Plaintiff] (she called my cell just now and I didn't recognize the number)." It takes a leap, from that statement, to conclude that Ms. Campbell was attempting to avoid Plaintiff. In the other, Ms. Campbell asks Dr. Spetalnick to "provide a statement about what he witnessed . . . that none of the 3 incidents was an 'emergency' situation." Again, it requires a leap to conclude from that request that Ms. Campbell somehow had the power to control how Dr. Spetalnick would respond.

Regardless, whether or not Ms. Campbell was biased against Plaintiff is not the issue. The issue is whether any alleged bias was based on Plaintiff's age. See, Rowan v. Lockheed Martin Energy Sys., Inc., 360 F.3d 544, 547 (6th Cir. 2004) (plaintiff "must establish that the legitimate reasons offered by the defendant were just a pretext for decisions actually motivated by an unlawful bias against age"); Bender, 455 F.3d at 620 (same).